1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| ALAN HOPKINS, derivatively on behalf of HQ SUSTAINABLE MARITIME INDUSTRIES, INC., | Case No. |
| Plaintiff, | |
| vs. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND WASTE OF CORPORATE ASSETS |
| NORBERT SPORNS, LILLIAN WANG LI, HARRY WANG HUA, FRED BILD, KEVIN M. FITZSIMMONS, DANIEL TOO, and JEAN-PIERRE DALLAIRE, | |
| Defendants, | JURY TRIAL DEMANDED |
| — and — | |
| HQ SUSTAINABLE MARITIME INDUSTRIES, INC., | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    Plaintiff Alan Hopkins, by and through his attorneys, brings this action derivatively on

2 behalf of nominal defendant HQ Sustainable Maritime Industries, Inc. ("HQSM" or the

3 "Company") and alleges upon personal knowledge as to himself and his own acts, and as to all

4 other matters based upon the investigation conducted by his attorneys which included, among

5 other things, a review of Securities and Exchange Commission ("SEC") filings, documents,

6 analyst reports, news reports, press releases, and other publicly available information regarding

7 the Company, as follows:

8                                            **INTRODUCTION**

9    1.    This is a shareholder derivative action brought on behalf of the Company against

10 the members of its Board of Directors ("Board") and certain of its executive officers seeking to

11 remedy defendants' breaches of fiduciary duties and other violations of the law that occurred

12 from at least May 11, 2009 through April 1, 2011 ("Relevant Period").

13    2.    Defendant HQSM produces and markets functional and sustainable biomass

14 products focused on Tilapia aquaculture.  The Company produces and sells wholesale feed

15 products as well as retail-focused nutraceutical and health products through direct and franchise

16 sales in China.  The Company also sells products within the United States.

17    3.    HQSM trades on the American Stock Exchange ("AMEX") under the symbol

18 HQS.

19    4.    Throughout the Relevant Period, defendants in their public fillings, press releases,

20 and communications with analysts touted the Company's sales, revenue, and net income.  For

21 example, in a press release dated May 10, 2010, Chief Executive Officer ("CEO") and director

22 Norbert Sporns stated, "We are pleased to report a strong improvement in our sales and

23 profitability.  We are building strong international partnerships across each of our product

24 segments through the credibility and efficacy of our products and brands.  These partnerships

25 give us great confidence in our business model and our long-term growth opportunities."

26    5.    Defendants, however, had no reasonable basis for their positive statements about

27 the Company's growth prospects.  In reality, defendants engaged in widespread and long-lasting

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

wrongful conduct against the Company.  Defendants manipulated company accounts and customer positions to materially overinflate HQSM's financial performance.  When the Company's own internal auditors began to question the integrity of the Company's financial reporting, defendants responded by deliberately stonewalling and obstructing the Company's audit committee from seeking assistance from outside special counsel.

6.      The friction between defendants and the Company's audit committee led the company to miss the filing of its financial statements and annual report with the SEC as scheduled on March 16, 2011.  Instead of revealing the truth as to what was happening behind the scenes, defendants sought a 15-day extension due to "delays in compiling information."  Defendants assured the market that they would file by April 1, 2011.  Yet, they would miss that deadline too.  It was not until April 6, 2011, that a shocking letter from the Chairman of HQSM's audit committee revealed why.

7.      In a letter dated April 6, 2011, the Chairman of HQSM's audit committee, Andrew Intrater, shocked the market when he abruptly resigned and disclosed defendants' extraordinary lengths to cover their wrongful conduct including refusing to cooperate with the Audit Committee's investigation and blocking the Company's independent auditors from reviewing data necessary to audit HQSM's reported sales and revenues.  Mr. Intrater further revealed that defendants' conduct was of such an egregious nature that the Company's legal counsel withdrew its representation of the Company.

8.      Defendants' actions have caused the Company to suffer substantial injury.  Indeed, HQSM's shares fell nearly 15% on March 16, 2011 after defendants revealed that HQSM needed a 15-day extension to file its 2010 financial statements.  Causing even greater injury to the Company was the revelation that, on April 1, 2011, HQSM was still out of compliance with federal laws and AMEX listing standards.  This caused AMEX to suspend the Company's shares from trading.  The Company's shares have not resumed trading since.

9.      Defendants were fully aware of the problems related to the reporting of HQSM's sales and the Company's wrongful accounting practices and yet they breached their fiduciary

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT
- 2 -
LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  duties and caused significant harm to the Company.  Defendants remain in breach of their

2  fiduciary duties and, absent Court intervention, the Company continues to be harmed.

3  **JURISDICTION AND VENUE**

4      10.    This Court has jurisdiction pursuant to 28 U.S.C. §1332(a) because plaintiff and

5  defendants are either citizens of different states or citizens of a state and citizens or subjects of a

6  foreign state and the amount in controversy exceeds $75,000 exclusive of interests and costs.

7  This action is not a collusive action designed to confer jurisdiction on a court of the United

8  States that it would not otherwise have.

9      11.    This Court has jurisdiction over each defendant because each defendant is either a

10  corporation that conducts business in, and maintains operations in, this District, or is an

11  individual who has sufficient minimum contacts with this District so as to render the exercise of

12  jurisdiction by the District courts permissible under traditional notions of fair play and

13  substantial justice.

14      12.    Venue is proper in this Court under 28 U.S.C. §1391(a) because (1) one or more

15  defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion

16  of the transactions and wrongs complained of herein, including the defendants' primary

17  participation in the wrongful acts detailed herein, occurred within this District, and

18  (3) defendants have received substantial compensation in this District by conducting business

19  herein and by engaging in numerous activities that have had an effect in this District.

20  **THE PARTIES**

21  **Plaintiff Shareholder**

22      13.    Plaintiff Allen Hopkins is a current shareholder of HQSM and has been a

23  shareholder of the Company during the Relevant Period.  Plaintiff currently owns approximately

24  75,000 shares of HQSM stock.  Plaintiff is a resident of the Commonwealth of Pennsylvania.

25  **Nominal Defendant HQ Sustainable Maritime Industries, Inc.**

26      14.    Nominal defendant HQSM is engaged in the production, processing, and farming

27  of all natural tilapia, other aquatic products, and marine bio and healthcare products.  Nominal

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 3 -

1    defendant HQSM is a Delaware corporation that maintains its headquarters in Seattle,

2    Washington.

3    **Individual Defendants**

4        15.    Defendant Norbert Sporns ("Sporns") served as HQSM's President, CEO, and a

5    director of the Company during the Relevant Period.  Defendant Sporns co-founded HQSM in

6    1997 and helped take the company public in 2004.  Plaintiff is informed and believes that

7    defendant Sporns is a resident of the State of Washington.

8        16.    Defendant Lillian Wang Li ("Li") served as HQSM's Chairman of the Board and

9    Secretary during the Relevant Period.  Defendant Li is one of the founders of the Company and

10    is responsible for the general administration, strategic planning, and financial management of

11    HQSM.  Defendant Li is also married to defendant Sporns.  Plaintiff is informed and believes

12    that defendant Li is a resident of the state of Washington.

13        17.    Defendant Harry Wang Hua ("Hua") served as a director and Chief Operating

14    Officer of the Company during the Relevant Period.  Defendant Hua is one of the founders of the

15    Company.  Defendant Hua is also the brother of defendant Li.  Plaintiff is informed and believes

16    that defendant Hua maintains his residency outside of the United States.

17        18.    Defendant Kevin M. Fitzsimmons ("Fitzsimmons") served as a director of the

18    Company during the Relevant Period.  Fitzsimmons has previously served as a President of the

19    World Aquaculture Society and Chairman of Aquaculture without Borders.  Plaintiff is informed

20    and believes that defendant Fitzsimmons is a resident of the State of Arizona.

21        19.    Defendant Fred Bild ("Bild") is and was at all relevant times a director of the

22    Company.  Mr. Bild serves on the Company's audit and compensation committees.  Plaintiff is

23    informed and believes that defendant Bild maintains his residency outside of the United States in

24    Montreal, Canada.

25        20.    Defendant Daniel Too ("Too") is and was at all relevant times a director of the

26    company.  Defendant Too serves on the Company's audit and compensation committees.

27

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    Plaintiff is informed and believes that defendant Too maintains his residency outside of the

2    United States in China.

3        21.    Defendant Jean-Pierre Dallaire ("Dallaire") is and was at all relevant times the

4    Chief Financial Officer, Chief Accounting Officer and financial controller of HQSM.  Plaintiff is

5    informed and believes that defendant Dallaire maintains his residency in the state of Florida.

6        22.    Defendants Sporns, Li, Ha, Fitzsimmons, Bild, Too, and Dallaire are collectively

7    referred to herein as the "Individual Defendants."

8                        **DUTIES OF THE INDIVIDUAL DEFENDANTS**

9        23.    By reason of their positions as officers and directors of the Company, and because

10   of their ability to control the business and corporate affairs of the Company, the Individual

11   Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust,

12   loyalty, and due care, and were and are required to use their utmost ability to control and manage

13   the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and

14   are required to act in furtherance of the best interests of the Company and its shareholders so as

15   to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

16       24.    Each director and officer of the Company owes to HQSM and its shareholders the

17   fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

18   Company and in the use and preservation of its property and assets, and the highest obligations

19   of fair dealing.  In addition, as officers and directors of a publicly held company, the Individual

20   Defendants had a duty to promptly and timely disseminate accurate and truthful information with

21   regard to the Company's revenue, margins, operations, performance, management, projections,

22   and forecasts so that the market price of the Company's stock would be based on truthful and

23   accurate information.

24       25.    The Individual Defendants, because of their positions of control and authority as

25   directors and/or officers of HQSM, were able to and did, directly and/or indirectly, exercise

26   control over the wrongful acts complained of herein, as well as the contents of the various public

27   statements issued by the Company.  Because of their executive, managerial, and directorial

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 5 -

positions with HQSM, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and misrepresentations made.

26.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of HQSM, and was at all times acting within the course and scope of such agency.

27.     To discharge their duties, the officers and directors of HQSM were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of HQSM were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of HQSM in accordance with all applicable laws;

b.     neither violate nor knowingly permit any officer, director, or employee of HQSM to violate applicable laws, rules, and regulations;

c.     establish and maintain systematic and accurate records and reports of the business and affairs of HQSM and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.     neither engage in self-dealing nor knowingly permit any officer, director, or employee of HQSM to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.     conduct the affairs of the Company in an efficient business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.     properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 6 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

   h.   remain informed regarding how HQSM conducted its operations and, upon receipt of notice or information of imprudent or sound conditions or practices, to make reasonable inquiry in connection therewith and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

   28.   Each Individual Defendant, by virtue of his or her position as a director and officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and officers of HQSM, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining director defendants who collectively comprised all of HQSM's Board during the Relevant Period.

   29.   The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects as detailed herein, and by failing to prevent employees and/or officers of the company from taking such illegal actions.  In addition, the Company is now the subject of a class action alleging violation of federal securities laws, which necessitates the Company incurring excess costs arising from the Individual Defendants' wrongful course of conduct.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 7 -

30.     Additionally, HQSM has established a Code of Ethics and Business Conduct ("Code") that applied to all employees of the Company.  The Code among other things provides as follows:

- HQ will conduct our business in accordance with all applicable federal, state and local laws and regulations, and the laws of foreign countries where we transact business.  Legal compliance is only a part of our ethical responsibility, however, and should be viewed as the minimum acceptable standard of conduct honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; and that

- All employees are expected to be honest and forthright in their interactions with one another and in dealings with customers, suppliers, business partners and shareholders.  HQ will not condone dishonesty or deceitful actions in any form.  This includes, but is not limited to, making misrepresentations to customers, changing customer documents, making false or misleading entries on the Company's books or ledgers, inflating expense reports, or falsely recording hours worked on time cards.

31.     With respect to the accuracy of record keeping and disclosures the Code provides:

Public Reporting Requirements

Accounting and other business records are relied upon in the preparation of reports HQ files with certain government agencies, such as the Securities and Exchange Commission (SEC).  These reports must contain full, timely and understandable information and accurately reflect our financial condition and results of operations.

Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports must strive to ensure that our financial disclosures are accurate and verifiable, thus to enable shareholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.  The integrity of our public disclosures depends on the accuracy and completeness of our records.  To that end:

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 8 -

- All business transactions must be supported by appropriate documentation and reflected accurately in our books and records;

- No entry be made that intentionally mischaracterizes the nature or proper accounting of a transaction;

- No HQ employee may take or authorize any action that would cause our financial records or disclosures to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- All employees must cooperate fully with our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- No employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any report filed with the SEC or other government agency, or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

- Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a manager, the Company's Chief Financial Officer and/or to the Company's Internal Audit or Legal departments.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

32.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

33.     During all times relevant hereto, the Individual Defendants collectively and individually initiated and pursued a course of conduct that was designed to and did:

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 9 -

a.      Conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares;

b.      Maintain the Individual Defendants' executive and directorial positions at HQSM and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and

c.      Deceive the investing public, including shareholders of HQSM, regarding the Individual Defendants' management of HQSM's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.

34.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

35.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct commencing by at least May 11, 2009 and continuing thereafter. During this time, the Individual Defendants caused the Company to conceal the true facts that HQSM was misrepresenting its financial results and violating applicable laws.  In addition, defendants also made other specific false statements about HQSM's financial performance and future business prospects, as alleged herein.

36.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things:

a.      to disguise the Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment;

b.      to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and

c.      to artificially inflate the price of HQSM's common stock so they could protect and enhance their executive and directorial positions and receive the substantial compensation and prestige they obtained as a result thereof.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 10 -

37.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

38.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## COMPANY BACKGROUND

39.    HQSM is a global provider of health products derived from marine based raw materials, as well as Talapia.  HQSM's annual report (Form 10-K) for the year ended December 31, 2010, in relevant part stated:

> We are a multi-national company with our headquarters and primary sales offices based in Seattle, Washington.  We are a vertically integrated aquatic product producer, processor, and farmer (e.g. through cooperative arrangements with pond farmers), with operations in the People's Republic of China, or the PRC, of all natural tilapia, other aquatic products, and marine bio and healthcare products. We use state-of-the-art and environment-friendly technologies in our production, processing, and cooperative farm operations.  Our facilities are currently certified according to the Hazard Analysis and Critical Control Point ("HACCP") standards, currently assigned a European Union ("EU") code required for exporting aquatic products to the EU, and are currently certified in accordance with the Aquaculture Certification Counsel ("ACC") standards.  Our products are sold principally to customers in North America, Europe and Asia.  Our current sales activity is primarily directed to distributors within the PRC, rather than within the U.S.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 11 -

Established in 1999, our aquatic farming and processing operations are in Hainan Province, an island in the South China Sea, which is situated within the most desirable latitude for raising tilapia.  The Chinese government has designated Hainan Province in southern China a "green" province, where only environmentally friendly agri-food related industry and tourism are permitted.  We purchase and process farm bred and farm raised tilapia through cooperative supply arrangements with local farmers and cooperatives.  Our supply cooperatives, under our guidance, use feed formulated by us to optimize the all natural growth of farm raised tilapia.  Starting in 2009, we began supplying the farmers and cooperatives with feed formulated from our feed processing mill.  We believe our tilapia products have achieved such a high level of purity that we market these products as all natural tilapia.  In addition, we purchase and process ocean-caught aquatic products through cooperative supply arrangements with local fisherman for our marine bio healthcare products.

In August 2004, the company acquired Hainan Jiahua Marine BioProducts Co. Ltd., or Jiahua Marine, which develops, produces and sells marine bio and healthcare products, including nutraceutical products for the enrichment of our feed formulas, exclusively in China.  The principal products of Jiahua Marine are manufactured from fish by-products (tilapia and shark) that include shark cartilage capsules and shark liver oil products that are distributed exclusively in China.  The products undergo substantial independent laboratory testing administered by the Ministry of Health in China, which has resulted in a PRC National Certification for these products.  These products have various perceived medicinal and health benefits.  As part of HQS's vertical integration plan with respect to tilapia, Jiahua Marine introduced new bio and healthcare products made from tilapia in 2009.

In order to maintain the high quality of our products and to position ourselves for attaining completely organic production certification in the future, we have completed the construction of our own feed mill and processing plant for the production of floating feed formulations.  We produce the feed using grains grown without chemical fertilizers, free of antibiotics and fishmeal, and use feed additives manufactured in our nutraceutical plant.  We plan for this expanded production to satisfy our own demand through the 20,000 mu (or 3,294 acres) of production in Wenchang and Qionghai, as well as to manufacture feed for others' farmed operations in Hainan, such as shrimp and other farmed species.

From our headquarters in Seattle, Washington, we market and brand our high-quality, all natural tilapia products under the name TILOVEYA.  In early 2009, we introduced a new family of frozen tilapia meals under the brand name "Lillian's Healthy Gourmet."  This new family of products includes an organic, natural and regular line of frozen tilapia meals.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 12 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

40.     The Company operates within two main industries (Aquaculture and Tilapia) are rapidly growing.  The Company's annual report on Form 10-K further explained that:

**Aquaculture Industry**

Aquaculture is the farming of aquatic animals or plants.  Aquaculture is the fastest growing segment in the food production system and has been for the past two decades.  According to a recent study by the World Food and Agriculture Organization ("FAO") published March 2, 2009 world fisheries production reached a new high of 143.6 million metric tonnes in 2006, including farmed and ocean caught product.  The contribution of aquaculture to the world fisheries production in 2006 was 51.7 million tonnes of fish, which is 36% of world fisheries production up from 3.6% in 1970.  Global aquaculture accounted for 6% of the fish available for human consumption in 1970.  In 2006 global aquaculture accounted for 47% of the fish available for human consumption according to the FAO.  The FAO report also describes that over half of the global aquaculture in 2006 was freshwater finfish.  Based on the FAO's projections, it is estimated that in order to maintain the current level of per capita consumption, global aquaculture production will need to reach in excess of 80 million tonnes of fish by 2050.

As the availability of sites for aquaculture is becoming increasingly limited and the ability to develop non-agricultural land is often restricted, the competition to develop additional aquaculture production systems is intensifying.  As the intensification for aquaculture production systems increases, the demand for institutional support, services and skilled persons is anticipated to increase, along with the demand for more knowledge-based aquaculture education and training as aquaculture becomes more important worldwide.  China remains the largest producer of aquaculture products throughout the world with fisheries in China reportedly producing approximately 41.3 million tonnes of fish in 2004.  Within the global aquaculture industry, China accounted for 71.0% of the world's supply of fish for direct human consumption and 29.9% of the total production by live weight in 2002.

**Tilapia Industry**

In 2005, according to the American Tilapia Association ("ATA"), tilapia production worldwide was second in volume to carp, and it is projected by the ATA that tilapia will become the most important aquaculture crop in this century, potentially reaching $5.0 billion in global sales by 2010.  Commercial production of tilapia has become popular in many countries around the world.  Touted as the "new white fish" to replace the depleted ocean stocks of cod, pollock, and hake,

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 13 -

Law Offices of
Clifford A. Cantor, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

world tilapia production continues to rise and at least 100 countries currently raise tilapia, with the PRC being the largest producer. The American Tilapia Association further reports that world production of tilapia products reached approximately 2.5 million metric tonnes in 2007, of which China produced the dominant share of 45.0%.

| U.S. Consumer Consumption Per Capita (lbs) | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2000** | | **2001** | | **2002** | | **2003** | | **2004** | | **2005** | | **2006** | | **2007** | | **2008 (est.)** | |
| Tuna | 3.5 | Shrimp | 3.4 | Shrimp | 3.7 | Shrimp | 4.0 | Shrimp | 4.2 | Shrimp | 4.1 | Shrimp | 4.4 | Shrimp | 4.1 | Shrimp | 4.0 |
| Shrimp | 3.2 | Tuna | 2.9 | Tuna | 3.1 | Tuna | 3.4 | Tuna | 3.4 | Tuna | 3.3 | Tuna | 2.9 | Tuna | 2.7 | Tuna | 2.6 |
| Pollock | 1.6 | Salmon | 2.0 | Salmon | 2.0 | Salmon | 2.2 | Salmon | 2.4 | Salmon | 2.4 | Salmon | 2.0 | Salmon | 2.3 | Salmon | 2.2 |
| Salmon | 1.5 | Pollock | 1.2 | Pollock | 1.1 | Pollock | 1.7 | Pollock | 1.7 | Pollock | 1.5 | Pollock | 1.6 | Pollock | 1.7 | Pollock | 1.6 |
| Catfish | 1.1 | Catfish | 1.1 | Catfish | 1.1 | Catfish | 1.1 | Catfish | 1.1 | Catfish | 1.0 | Tilapia | 1.0 | Tilapia | 1.1 | Tilapia | 1.2 |
| Cod | 0.8 | Cod | 0.6 | Cod | 0.7 | Cod | 0.6 | Tilapia | 0.7 | Tilapia | 0.8 | Catfish | 1.0 | Catfish | 1.0 | Catfish | 1.0 |
| Clams | 0.5 | Clams | 0.5 | Crabs | 0.6 | Crabs | 0.6 | Cod | 0.6 | Cod | 0.6 | Crabs | 0.7 | Crabs | 0.7 | Crabs | 0.7 |
| Crabs | 0.4 | Crabs | 0.4 | Clams | 0.5 | Tilapia | 0.5 | Crabs | 0.6 | Crabs | 0.6 | Cod | 0.6 | Cod | 0.5 | Clams | 0.4 |
| Flatfish | 0.4 | Flatfish | 0.4 | Tilapia | 0.4 | Clams | 0.5 | Clams | 0.4 | Clams | 0.4 | Clams | 0.4 | Clams | 0.4 | Cod | 0.4 |
| Scallops | 0.3 | Tilapia | 0.4 | Flatfish | 0.4 | Scallops | 0.3 | Scallops | 0.3 | Scallops | 0.3 | Scallops | 0.3 | Scallops | 0.3 | Scallops | 0.3 |
| Tilapia | 0.3 | | | | | | | | | | | | | | | | |

One of the major outlets for Chinese-produced tilapia has been, and should continue to be, the United States. The following chart reflects the increase in per-capita consumption of tilapia in pounds in the United States in relation to other traditional types of seafood.

The following chart reflects the increase in imported tilapia to the United States during the periods indicated.



Separately, according to the *International Trade Report* produced in 2005 by the United States Department of Agriculture, or the USDA, "U.S. per-capita seafood consumption has remained around 15 billion pounds through the late 1980s and

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1990s; it is expected to increase as farm-raised products become cheaper. Currently, the United States consumes nearly 12 billion pounds of fish a year.  By 2025, demand for seafood is projected to grow by another 4.4 billion pounds (2 million metric tonnes) above what is consumed today.  In addition, it is estimated that by 2020, 50% of the U.S. seafood supply will come from aquaculture. Presently, more than 70% of the seafood consumed in the United States is imported, and at least 40% of that is farm-raised.  Major changes in U.S. population, along with shifting demographics and economic growth, will alter the U.S. seafood market over the next decade, affecting the selection of products consumed.  It is expected that fresh and frozen fish products will account for a growing share of overall seafood consumption, with shrimp remaining at the top. By 2020, shrimp, salmon, tilapia, and catfish will be the top four seafood products consumed."

According to Globefish.org, during the past ten years, tilapia captured by fisheries have stabilized at 0.6 million metric tonnes, while their aquaculture production has grown from 0.55 million metric tonnes to 2.0 million metric tonnes.  Tilapia is one of the top five seafood imports in the world.  In 2005, more than $2.4 billion of tilapia was sold worldwide according to the FAO Fishstat 2007.  In 2005, tilapia moved up to the fourth-ranked most popular seafood after farm-raised shrimp, tuna and Atlantic salmon in terms of aquaculture products imported into the United States.  The United States is now the world's largest consumer of tilapia, after China, having imported 437 thousand metric tonnes of tilapia in 2007.  In terms of volume, frozen whole round fish ranks first, followed by frozen fillets and, lastly, fresh fillets.

The growing consumer demand for seafood is largely evolving from a new public awareness regarding its health and nutritional benefits.  The USDA "pyramid" guidelines continue to support frequent fish consumption, and the USDA recently completed a highly technical nutritional analysis report about tilapia for the general public.  The USDA's Agriculture Research Service Lab reports that tilapia is moderate in polyunsaturated fatty acid (0.387 g/100g raw, 0.600 g/100g cooked), moderate in omega 3 fatty acids (0.141g/100g raw, 0.220g/100g cooked) and low in mercury (0.010 parts per million, which we refer to as PPM), which is considered to be non-detectable.  With the increased awareness of the health concerns surrounding mercury, tilapia's low mercury levels (0.010 PPM) distinguish tilapia favorably from other types of fish with higher mercury levels, such as swordfish (0.976 PPM), mackerel (0.730 PPM) and yellow fin tuna (0.325 PPM).

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 15 -

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

41.     The Relevant Period begins on May 11, 2009.  On this date, HQSM issued a press release announcing its financial results for the 2009 fiscal first quarter.  Therein, the Company, in relevant part, stated:

**HEADLINE: HQ Sustainable Maritime Reports First Quarter Results; Sales Increased 18% Year-Over-Year**

**DATELINE: SEATTLE, WA; May 11, 2009**

**BODY:**

HQ Sustainable Maritime Industries, Inc. (NYSE Amex: HQS) ("HQS" or the "Company"), a leader in all natural integrated aquaculture and aquatic product processing including fish byproduct personal healthcare products, today announced its financial results for the first quarter ended March 31, 2009.

First Quarter 2009 Results

For the quarter ended March 31, 2009, sales increased by 18% to $10.8 million, compared to $9.2 million for the first quarter of 2008.  The Aquaculture Product segment accounted for $7.3 million in sales, up 12% from $6.5 million reported for the same period last year.  Sales from the Health and Bio-product segment were $3.5 million, up 32% from $2.6 million for the first quarter of 2008.

The gross profit for the first quarter of 2009 increased by 22% to $4.8 million, compared to gross profit of $3.9 million for the same period of 2008.  The overall gross profit ratio increased to 44%, compared to 42% for the three month period ended in March 31, 2008.

42.     Defendant Sporns commented on the results, stating:

I am very pleased by our performance during the first quarter.  We hit the ground running in 2009, building upon the momentum we gained from a very strong 2008.  Our growth this quarter was achieved in spite of this being a traditionally slower period as a result of decreased business activity surrounding the Chinese New Year.  Our business also proved resilient in a tough global economic environment, *as we experienced strong sales improvements in both of our segments.*  (Emphasis added.)

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 16 -

43.     That same day, the Company filed its quarterly report for 2009 fiscal first quarter with the SEC.  The quarterly report was signed by defendants Sporns and Dallaire in their capacities as CEO and Chief Accounting Officer for the Company.

44.     Included with the Form 10-Q filed with the SEC, were sworn certifications of defendants Sporns and Dallaire which included the following representations about the Company's disclosure and internal controls.  Defendants Sporns and Dallaire each certified as follows:

1.     I have reviewed this quarterly report on Form 10-Q of HQ Sustainable Maritime Industries, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The Registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the Issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the Issuer's internal control over financial reporting that occurred during the Registrant's fiscal quarter ending March 31, 2009 that has materially affected, or is reasonably likely to materially affect, the Issuer's internal control over financial reporting; and

5.     The Registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditor and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

45.     Defendants Sporns and Dallaire repeated these representations regarding HQSM's disclosure controls, and defendants' certifications thereon, in quarterly reports on Form 10-Q and annual reports on Forms 10-K that HQSM filed with the SEC during the Relevant Period.

46.     The market reacted positively to the statements contained within the May 11, 2009 press release and quarterly filing.  HQSM shares closed trading on that day *up nearly 5%.* However, the representations in both the press release and the quarterly filing were materially false and misleading in that the Company's financial results were manipulated through wrongful accounting practices that did not comply with GAAP standards and/or SEC regulations.  The

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

certifications that accompanied the quarterly filing were likewise materially false and misleading given that defendants were aware that the financial statements were materially misrepresented through the inclusion of material amounts of "sales" that did not qualify for inclusion under relevant accounting standards, and that HQSM's system of accounting internal control was materially flawed and not properly designed to ensure accurate financial reporting.

47.     The May 11, 2009, misrepresentations had the effect of artificially inflating HQSM's stock price and also allowed the Company to complete an offering of 1.2 million shares of stock for a total of $10.4 million on June 17, 2009.  Related to the Company's offering is that, on June 30, 2009, HQSM announced in a press release that its underwriter had exercised an over-allotment option to purchase an additional 183,750 shares of Company stock.  There was no need for the over-allotment which harmfully resulted in a dilution of the Company's equity.

48.     On August 10, 2009, HQSM issued a press release announcing its financial results for the 2009 fiscal second quarter.  Therein, the Company, in relevant part, stated:

**HEADLINE: HQ Sustainable Maritime Reports Second Quarter Results; EBITDA up 525% to $3.2 Million From $512,000 in Q2 2008**

**DATELINE: SEATTLE, WA; Aug 10, 2009**

**BODY:**

HQ Sustainable Maritime Industries, Inc. (NYSE Amex: HQS) ("HQS" or the "Company"), a leader in all natural integrated aquaculture and aquatic product processing, including fish byproduct personal healthcare products, today announced its financial results for the second quarter ended June 30, 2009.

Second Quarter 2009 Results

For the quarter ended June 30, 2009, sales increased by 10% to $16 million, compared to $14.5 million for the second quarter of 2008.  The Aquaculture Product segment accounted for $10.5 million in sales, up 9% from $9.6 million reported for the same period last year.  Sales from the Health and Bio-product segment were $5.5 million, up 12% from $4.9 million for the second quarter of 2008.  Gross profit for the second quarter of 2009 increased by 37% to $6.8 million, compared to gross profit of $5 million for the same period of 2008.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

49.     Defendant Sporns commented on the results, stating:

The second quarter once again saw strong top line growth across our business segments, and though our net income was adversely affected by new accounting rules, we believe that this revenue growth demonstrates the significant leverage that our business model continues to hold.  Highlights for the second quarter also included very favorable increases in our gross profit margins.  Fueling this leverage and our continued vertical integration was the recent completion of our feed mill.  This addition renders our feed the most efficient feed available in China to Tilapia farmers, reducing feed cost for farmers while guaranteeing for consumers quality at a very high level.

50.     The press release and defendants Sporns's comments were materially false and misleading given that financial results reported were materially false and did not comply with GAAP standards and SEC regulations.

51.     On August 10, 2009, the Company filed its quarterly report on Form 10-Q with the SEC for the 2009 fiscal second quarter.  The report was signed by defendants Sporns and Dallaire and contained the same materially false and misleading financial results announced that day.  Signed certifications of defendants Sporns and Dallaire accompanied the quarterly report were false and misleading for the same reasons as discussed above in connection with the certifications contained in the Company's quarterly report on Form 10-Q filed with the SEC for the 2009 fiscal first quarter.

52.     On November 9, 2009, HQSM issued a press release announcing its financial results for the 2009 fiscal third quarter.  Therein the Company emphasized a dramatic increase in the Company's gross profit margin.  The press release, in relevant part, stated:

**HEADLINE: HQ Sustainable Maritime Reports Third Quarter Results; Gross Profit Margin up 17.3% From the First Nine Months of 2008**

**DATELINE: SEATTLE, WA; Nov 09, 2009**

**BODY:**

HQ Sustainable Maritime Industries, Inc. (NYSE Amex: HQS ) ("HQS" or the "Company"), a leader in all natural integrated aquaculture and aquatic product

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 20 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

processing, including fish byproduct and personal healthcare products, today announced its financial results for the third quarter ended September 30, 2009.

Third Quarter 2009 Results

For the quarter ended September 30, 2009, sales decreased by 1.4% to $22.2 million, compared to $22.4 million for the third quarter of 2008.  The Aquaculture Product segment accounted for $14 million in sales, down 7% from $15.1 million reported for the same period last year.  Sales from the Health and Bio-product segment were $8.1 million, up 10% from $7.3 million for the third quarter of 2008.

Net income for the third quarter was $4 million, or $0.268 cents per fully diluted share compared to net income of $5.6 million, or $0.427 cents per fully diluted share, for the third quarter of 2008.  Net income during the current quarter was affected by increases in doubtful accounts of approximately $1,606,000 and marketing and advertising expenses by approximately $979,000 from the health and bio-product segment.

53.     CEO Sporns commented on the results, stating:

Our Company continues to see significant demand for its biomass products, and to benefit from the manner in which we have balanced our portfolio of product offerings to reduce the impact of seasonality and price fluctuations.  During the quarter, increased demand for our Marine Bio and Healthcare products resulted in *much improved sales*, and helped to mitigate the impact of the reduction in the selling price of tilapia in our aquatic products segment that we have seen this year.  Increased vertical integration is also beginning to pay dividends, as we saw decreased raw material costs with respect to our fish and other indirect expenses during the quarter.  *This has resulted in a significant improvement in our profitability so far in 2009, and we hope to see this trend continued in future quarters*.  (Emphasis added.)

54.     The press release was materially false and misleading because the financial results contained therein were false and did not comply with GAAP standards and relevant SEC regulations.  Additionally, defendant Sporns's comments were false and misleading for the same reasons.

55.     On November 9, 2009, HQSM filed its quarterly report on Form 10-Q with the SEC for the 2009 fiscal third quarter.  The Company's quarterly report on Form 10-Q was signed by defendants Sporns and Dallaire and contained the same materially false and misleading

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

financial results announced that day.  Additionally, the quarterly report on Form 10-Q was accompanied by the certifications of defendants Sporns and Dallaire, which were materially false and misleading for the same reasons as those contained in the Form 10-Q the Company filed with the SEC for the 2009 fiscal first quarter.

56.     On March 15, 2010, HQSM issued a press release announcing its financial results for 2009 fiscal year end and the fourth quarter.  The Company, in relevant part, stated:

> HQ Sustainable Maritime Industries, Inc. (NYSE Amex: HQS) ("HQS" or the "Company"), a leading producer of functional, sustainable Tilapia biomass, including fish and personal healthcare products, today reported financial results for the fourth quarter and full year ended December 31, 2009.
>
> Fourth Quarter 2009 Results
>
> For the fourth quarter of 2009, net sales increased 8.2% to $23.3 million, compared to $21.5 million for the fourth quarter of the prior year.  The increase in net sales was primarily the result of a strong performance in the health and bio-product segment.
>
> Net income for the fourth quarter of 2009 was $1.6 million, or $0.12 per diluted share compared to net income of $6.4 million, or $0.53 per diluted share in the fourth quarter of 2008.  Net income during the fourth quarter of 2009 was affected by increases in doubtful accounts of approximately $2.9 million and an increase in marketing and advertising expenses by approximately $1.8 million from the health and bio-product segment.

57.     Defendant Sporns commented on the results, stating:

> The Company successfully expanded its sales of high quality, health and bio-products made from Tilapia by-products, in response to a landmark shift in China food safety legislation passed in March of 2009, which caused the closure of several of China's health and food product manufacturing facilities.  This unprecedented opportunity for our Company in China has resulted in a short term increase in receivables and higher marketing expenses in our health and bio-product segment.  In 2010, we believe our efforts to reposition our Company behind higher margin product categories combined with increased operating efficiencies from our vertically integrated operations will enable us to realize an exceptional period of strong sales, margin expansion, and long-term profitable growth.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 22 -

58.     The press release and defendant Sporns's comments were false and misleading given that the financial results therein were false and did not comply with GAAP standards and/or relevant SEC regulations.

59.     On March 15, 2010, HQSM filed its quarterly report for 2009 fiscal fourth quarter and the fiscal year ended December 31, 2009 on Form 10-K with the SEC.  The annual report was signed by defendants Sporns and Dallaire and contained the same materially false and misleading financial information as the March 15, 2010 announcement.  Additionally, the Form 10-K was accompanied by the certifications of defendants Sporns and Dallaire, which were materially false and misleading for the same reasons as those contained in the 10-Q quarterly report the Company filed for the 2009 fiscal first quarter with the SEC.

60.     The market was deceived as a result of the false and misleading statements defendants made throughout 2009.  Investors were given a false impression of the overall financial health and future prospects of the Company.  For example, Booth-Laird Investment Partnership, LLC stated the following in their 2009 Annual Letter stated the following:

> In summary, we deemed HQS's primary segment to be in a fantastic market with strong worldwide growth potential, to be advantageously located in China, able to control quality and costs through complete vertical integration, and could help reduce costs in their other segment, which was also growing rapidly and had recently seen some of their competition get wiped out due to poor quality.  In addition, we thought HQS had great management focused on controlling costs while still promoting innovation and quality.  We also loved the fact that HQS was trying to turn a commodity into a unique product and was on the leading edge worldwide in quality controls in the tilapia industry.

61.     Defendants continued to make false and misleading statements throughout 2010 to deceive the market about the Company's performance.

62.     On May 10, 2010, HQSM issued a press release announcing its operating results for the first quarter of 2010.  The release highlighted the fact that the company experienced improved financial results from the previous year.  The press release stated in relevant part:

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

For the first quarter of 2010, sales increased 33% to $14.4 million, compared to $10.8 million for the first quarter of the prior year.  The increase in sales was primarily the result of strength across each segment including aquaculture products, health and bioproducts, as well as the new feed products added in late 2009.

Net income for the first quarter of 2010 was $l.5 million, or $0.09 per diluted share compared to net income of $1.1 million, or $0.09 per diluted share in the first quarter of 2009.  Net income during the first quarter of 2010 was positively impacted by the net recovery in doubtful accounts of approximately $0.7 million and a decrease in marketing and advertising expenses by approximately $0.4 million from the health and bio-product segment.

63.     Defendant Sporns commented on the results, stating:

We are pleased to report a strong improvement in our sales and profitability.  In the first quarter, we successfully recovered more than 80% of our doubtful accounts.  The provisions for doubtful accounts were made in prior quarters as a result of a planned, strategic investment in our health and bio-product segment, in order to capture greater market share…We continue to focus on being leaders in the value added use of Tilapia fillet and Tilapia by-products.  We are building strong international partnerships across each of our product segments through the credibility and efficacy of our products and brands.  These partnerships give us great confidence in our business model and our long-term growth opportunities.

64.     The press release and defendant Sporns's comments were false and misleading given that the financial results therein were false and did not comply with GAAP standards and/or relevant SEC regulations.

65.     On May 10, 2010 HQSM filed its quarterly report for on Form 10-Q for the 2010 fiscal first quarter with the SEC.  The Company's quarterly report was signed by defendants Sporns and Dallaire and contained the same material false and misleading financial information announced that day.  Additionally, the Form 10-Q was accompanied by the certifications of defendants Sporns and Dallaire, which were materially false and misleading for the same reasons as those contained in the Form 10-Q the Company filed with the SEC for the 2009 fiscal first quarter.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 24 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

66.     On August 9, 2010 HQSM issued a press release announcing its fiscal 2010 second quarter financial results.  Therein, the Company highlighted its second quarter sales growth of 29%.  The press release, in relevant part,  stated:

**Second Quarter Sales Increased 29% to $20.7 Million, Compared to $16 Million Last Year**

**SEATTLE, WA, Aug. 9, 2010 (Marketwire) –**

SEATTLE, WA – (Marketwire) – 08/09/10 – HQ Sustainable Maritime Industries, Inc. (NYSE Amex: HQS) ("HQS" or the "Company"), a leading producer of functional, sustainable Tilapia biomass, including fish and personal healthcare products, today reported financial results for the second quarter ended June 30, 2010.

Second Quarter 2010 Results

For the second quarter of 2010, sales increased 29% to $20.7 million, compared to $16 million for the second quarter of the prior year.  The increase in sales was primarily the result of strength from the new feed products added in late 2009.

Aquaculture product segment sales increased 1% to $10.6 million, compared to $10.5 million in the second quarter of 2009.  The aquaculture product segment sales increase is primarily related to an overall volume reduction of 7% of fish products sold in the second quarter of 2010 compared to the second quarter of 2009, offset by average price increases the second quarter of 2010, compared to the same period last year.

Health and bio-product segment sales increased 6% to $5.8 million in the second quarter of 2010, compared to $5.5 million in the same period last year.  In addition, the Company's feed mill generated sales of $4.3 million.  This compares to sales of $3.1 million in the first quarter of 2010, as well as sales of $1.3 million in the fourth quarter of 2009, which was the first time the feed product segment began to generate revenue.

Gross profit for the second quarter of 2010 decreased 1% to $6.5 million, compared to $6.6 million in the second quarter of the prior year.  The Company's gross profit ratio decreased to 32% in the second quarter of 2010 versus 41% in the second quarter of 2009.  The gross profit ratio decrease is primarily related to the health and bio-products and the feed products segments.  The decrease in the

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 25 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

health and bio-products gross profit ratio is due to an increase in average packaging costs related to the new OMOJO brand.  In the feed product segment, we expect that the gross profit ratio will continue to improve in the coming periods as the volumes processed increases to support the fixed costs more favorably.

For the second quarter of 2010, operating income decreased to $2.4 million from $2.8 million in the same period of the prior year.  The decrease experienced in the quarter was primarily due to the provision for doubtful accounts in the aquaculture product segment as compared to the prior year to adjust to the extended collection period.  EBITDA for the second quarter of 2010 decreased to $2.9 million, compared to $3.1 million for the same period last year.

Net income for the second quarter of 2010 was $1.3 million, or $0.07 per diluted share calculated on 14.9 million diluted shares compared to net income of $1.1 million, or $0.09 per diluted share calculated on 12.6 million diluted shares in the second quarter of 2009.  In addition, net income for the second quarter of 2010 includes a one-time charge of $730,000, or $0.05 per diluted share, related to non-deductible marketing expenses in the second quarter of 2009, which resulted in additional income taxes in the health and bio-product segment this quarter.  Excluding the one-time charge, the Company reported adjusted net income of $2.1 million or $0.12 per diluted share.  Net income during the second quarter of 2010 was positively impacted by the fair value change in derivative financial instruments for an amount of $227,000 related to the outstanding warrants.  All of our notes have been converted as of December 31, 2009.  We will continue to evaluate quarterly this fair value change in the future until expiration of the warrants.

67.     Defendant Sporns commented on the results, stating:

We are pleased to report strong revenue growth for the second quarter.  Operationally our results improved sequentially and we are optimistic about our future growth in each of our three primary product segments.  We are laying the foundation to deliver long-term value to our shareholders.  We continue to focus on execution, including increased sales of our diversified products, increased margin expansion, and vertical integration in the production of our all-natural Tilapia aquaculture bio-mass which will further reduce the costs of production and increase long-term profitable growth and cash flow generation.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 26 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

68.     The press release and defendant Sporns's comments were false and misleading given that the financial results therein were false and did not comply with GAAP standards and/or relevant SEC regulations.

69.     On August 09, 2010 HQSM filed its quarterly report for on Form 10-Q for the 2010 fiscal second quarter with the SEC.  The Company's quarterly report on Form 10-Q was signed by defendants Sporns and Dallaire and contained the same materially false and misleading financial information as announced that day.  Additionally, the Form 10-Q was accompanied by the certifications of defendants Sporns and Dallaire, which were materially false and misleading for the same reasons as those contained in the Company's Form 10-Q filed with the SEC for the 2009 fiscal first quarter.

70.     The August 10, 2010 misrepresentations had the effect of artificially inflating HQSM's stock price and also allowed the Company to sell more than $11.5 million of Company Stock.  In a press release issued on August 9, 2010 the Company stated:

**HQ Sustainable Maritime Industries, Inc. Announces Pricing of Follow-On Offering**

**SEATTLE, WA, Aug. 10, 2010 (Marketwire) –**

SEATTLE, WA – (Marketwire) – 08/10/10 – HQ Sustainable Maritime Industries, Inc. (NYSE Amex: HQS) ("HQS" or the "Company"), a leading producer of functional, sustainable Tilapia biomass, including fish and personal healthcare products, today announced the pricing of a follow-on public offering of 3,202,999 units at $3.6125 per unit for an aggregate of 3,202,999 shares of common stock and warrants to acquire 1,601,499 shares of common stock.  Each unit consists of one common share and 0.5 of a warrant, with a per share exercise price of $4.5156.

The Company will receive $11,570,834 million in gross proceeds, prior to deducting underwriting discounts and commissions and offering expenses payable by the Company.  The Company expects to use these proceeds for general corporate purposes, including investments in its Marine Bio and Healthcare Products segment.  The offering is expected to close on August 13, 2010.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 27 -

71.     On November 9, 2010, defendants caused HQSM to issue a press release announcing its 2010 fiscal third quarter financial results.  The press release, in relevant part, stated:

**HQ Sustainable Maritime Industries, Inc. Announces Third Quarter 2010 Financial Results**

**Third Quarter Sales Increased 27% to $28.2 Million, Compared to $22.2 Million Last Year**

**Company Generated Third Quarter EBITDA of $8.0 Million, an Increase of 63%**

**Net Income Grew 70% to $6.9 Million, Compared to $4.0 Million Last Year**

Nov. 9, 2010 (Marketwire) –

SEATTLE, WA – (Marketwire) – 11/09/10 – HQ Sustainable Maritime Industries, Inc. (NYSE Amex: HQS) ("HQS" or the "Company"), a leading producer of functional, sustainable Tilapia biomass, including fish and personal healthcare products, today reported financial results for the third quarter ended September 30, 2010.

Third Quarter 2010 Results

For the third quarter of 2010, sales increased 27% to $28.2 million, compared to $22.2 million for the third quarter of the prior year.  The increase in sales was primarily the result of strength from the new feed products added in late 2009.

Aquaculture product segment sales decreased by 4% to $13.4 million, compared to $14.0 million in the third quarter of 2009.  The aquaculture product segment sales decrease is primarily related to an overall volume reduction of shrimp and ocean caught fish products sold in third quarter of 2010 compared to the third quarter of 2009, slightly offset by an increase in tilapia sales.

Health and bio-product segment sales increased by 6% to $8.6 million in the third quarter of 2010, compared to $8.1 million in the same period last year.  In addition, the Company's new feed mill generated sales of $6.2 million.

Gross profit for the third quarter of 2010 decreased 3% to $9.5 million, compared to $9.8 million in the third quarter of the prior year.  The Company's gross profit ratio decreased to 34% in the third quarter of 2010 versus 44.0% in the third quarter of 2009.  Although higher sales were recognized in the third quarter of

2010, the gross profit ratio decreased mostly due to a lower mix of segment gross profit from the feed products operations in the third quarter of 2010.

For the third quarter of 2010 operating income increased by $2.9 million or 60% to $7.8 million compared to $4.9 million in the same period of the prior year.  The operating income increase experienced in the third quarter of 2010 was primarily due to the recovery of bad debt, as the aging of receivables improved compared to the prior year period, which was slightly offset by lower gross profit.  In the third quarter of 2010, the Company realized a recovery of $2.0 million in doubtful accounts compared to the recognition of a potential loss of $1.3 million in doubtful accounts in the third quarter of 2009.

EBITDA for the third quarter of 2010 increased 63% or $3.1 million to $8.0 million, compared to $4.9 million for the same period last year.

Net income for the third quarter of 2010 increased by 70% or $2.8 million to $6.9 million, or $0.40 per diluted share calculated on 16.6 million diluted shares compared to net income of $4.0 million, or $0.27 per diluted share calculated on 14.8 million diluted shares in the third quarter of 2009.  Although the overall gross profit was less in the third quarter of 2010, the bad debt recovery had the most significant positive impact on the current quarterly results.

72.     Defendant Sporns commented on the results, stating:

We are extremely pleased with our third quarter financial performance.  Our management team continues to execute on our operational and strategic initiatives for growth…We believe we have laid the groundwork for future financial and operational successes through our vertically integrated approach to all-natural Tilapia aquaculture bio-mass product development and distribution.  We are very optimistic about our outlook for the remainder of 2010 and more importantly fiscal 2011 as we focus on long-term profitable growth and strong cash flow generation.

73.     The press release and defendant Sporns's comments were false and misleading given that the financial results therein were false and did not comply with GAAP standards and/or relevant SEC regulations.

74.     On November 09, 2010 HQSM filed its quarterly report on Form 10-Q for the 2010 fiscal third quarter with the SEC.  The report was signed by defendants Sporns and Dallaire and contained the same materially false and misleading financial information as announced that day.  Additionally, the Form 10-Q was accompanied by the certifications of defendants Sporns

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 29 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1   and Dallaire, which were materially false and misleading for the same reasons as those contained

2   in the Form 10-Q for the 2009 fiscal first quarter that the Company filed with the SEC.

3          75.     The market response to the Company's announcement and defendants' positive

4   statements was favorable.  TheStreet.com labeled HQSM as one of the ***"winners"*** for the week

5   and noted the following:

> NEW YORK (TheStreet) – Global equity markets fell last week on fears of
> China's tightening monetary policy and weakening confidence in the U.S.
> economic recovery.  China: Winners and Losers: HQ Sustainable Maritime
> Industries (HQS:AMEX) was the top gainer with a 34.5% increase.  Third-quarter
> sales were up 27% to $28.2 million from the year-ago period, following strong
> new feed products sales.  Net income for the quarter jumped 70% to $6.9 million,
> or 40 cents a share.

          76.     The Company was scheduled to release its next set of financial results on March

16, 2011.  On March 9, 2011 HQSM announced that it would disclose its operating results for

2010 fiscal fourth quarter and the year ended December 31, 2010 on March 16, 2011.  However,

this was not to be.

          77.     On March 16, 2011 the Company unexpectedly announced that it would file a

Notification of Late Filing on Form 12b-25 of its Fourth Quarter and Fiscal Year End 2010

reports.  However, instead of revealing to the market the true reason behind the delay, defendants

again misled the public stating an extension was needed to "compile information."  In a press

release dated March 16, 2011 the Company stated in relevant part:

> **HQ Sustainable Maritime Industries, Inc. to Postpone Fourth Quarter and
> Fiscal Year 2010 Earnings Release Date**
>
> Mar. 16, 2011 (Marketwire) –
>
> SEATTLE, WA – (Marketwire) – 03/16/11 – HQ Sustainable Maritime
> Industries, Inc. (NYSE Amex: HQS) ("HQS" or the "Company"), a leading
> producer and marketer of health products derived from marine based raw
> materials as well as Tilapia resulting from vertically integrated operations, will
> postpone the release of their fourth quarter and fiscal year 2010 earnings.  The
> Company will file a Notification of Late Filing on Form 12b-25 with the United
> States Securities and Exchange Commission for its Annual Report on Form 10-K

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 30 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

for the year ended December 31, 2010.  The Form 12b-25 will allow the Company an additional 15 calendar days to file the Form 10-K which is otherwise due on March 16, 2011.  Details regarding the specific release date and conference call will be provided in a forthcoming news release.

The postponement in filing is due to delays in compiling information for the preparation of the financial statements.  The Company fully expects to be able to file within the additional time allowed by the Form 12b-25 and plans to file as soon as possible following the completion of the audit of the financial statements.

78.     Then, on April 1, 2011, the Company reported that it would be forced to "postpone" the filing of its annual report on Form 10-K for the year ended December 31, 2010, stating in a press release:

**HQ Sustainable Maritime Industries, Inc. Postpones Filing of Form 10-K for the Year Ended December 31, 2010**

Apr. 1, 2011 (Marketwire) –

SEATTLE, WA – (Marketwire) – 04/01/11 – HQ Sustainable Maritime Industries, Inc. (NYSE Amex: HQS) ("HQS" or the "Company"), a leading producer and marketer of health products derived from marine based raw materials as well as Tilapia resulting from vertically integrated operations, has postponed the filing of its Form 10-K for the year ended December 31, 2010.  The Company is postponing the filing of its Form 10-K because the audit of the Company's financial statements has not been completed due to difficulties and delays in obtaining and verifying certain information.  The Company's independent auditors will continue to work toward the completion of the audit. The Company expects to complete the audit within approximately 30 days.

79.     As a result of this "postponement," the AMEX suspended HQSM from trading, and HQSM shares remain suspended to current date.

**DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING**

80.     As set forth herein, defendants' statements were materially false and misleading because:

a.     HQSM lacked a reasonable basis for the Company's positive statements about its financial conditions and prospects.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

b.     HQSM's quarterly and annual reports filed with the SEC were not in compliance with GAAP and/or SEC regulations.

c.     Irregular accounting practices were engaged in at the Company in order to manipulate company accounts and customer positions to materially overinflate HQSM's financial performance.

d.     HQSM failure to file its 2010 financial statements by April 1, 2011 was not due to "delays in compiling information in preparation of the financial statements."

### THE TRUTH BEGINS TO EMERGE

81.     On April 6, 2011, the Chairman of HQSM's audit committee, Andrew Intrater, issued an unexpected and shocking resignation letter.  In his letter Mr. Intrater stated that he was "compelled to resign" due to defendant Sporns's and others' obstruction of the Company's auditors from being able to adequately perform their job.  Mr. Intrater also revealed further damning evidence that the Company failed to file a notice of claim to the Company's directors' and officers' liability insurance carrier contrary to the advice of the Company's legal counsel. The advice from defendants' legal counsel was presumably given to address misconduct that had occurred at the Company.  This, among other things, apparently led to the resignation of the Company's legal counsel.  Mr. Intrater's letter stated the following:

> I am writing today to tender my resignation as an Independent Non-Executive Director and Chairman of the Audit Committee of HQ Sustainable Maritime Industries, Inc.  I am sending a copy of this letter to the board of directors, including the independent directors, out of respect for their roles.  I have also sent a copy to Armando Valeri, head of the audit team at Schwartz Levitsky Feldman. The last few weeks have been demanding, but the events of the last several days have caused me to *lose faith in the management of the company* and the path it is charting.  As a result, I feel have no choice but to make this difficult decision.
>
> As you are aware, over the last few weeks *issues have been raised during the audit process focusing on difficulties in verifying information relating to company accounts and customer positions.*  During that time, the audit committee has asked repeatedly that management cooperate with the audit process and provide the requested information and verifications on terms that were acceptable to both the auditors and company management.  Those efforts were

met with delay and resistance.  While some steps were taken to address the situation, they were insufficient to resolve the issues.  Just to be clear, I will discuss some of these details below.

On Tuesday (March 29), following discussions with you and other directors and in my capacity as Audit Committee Chairman, I engaged Latham & Watkins to conduct an independent inquiry into the concerns that developed during the audit process as to the possible breach of procedures relating to the verification or confirmation of company accounts and customer positions and the extent to which that possible breach extended beyond a handful of incidents.  All of this was under the pressure of the filing deadline, when time was of the essence.  That deadline was missed, however, and the trading of the company's stock was suspended as of April 1, 2011.

At the time that I initiated the independent inquiry, you pledged your cooperation.  Latham & Watkins tendered a list of requests to the company through lawyers at Troutman Sanders, which served as outside counsel for the firm, and they subsequently requested payment of a retainer to begin work.  This was followed on Thursday by a meeting of the board of directors in which the members of the management team who serve on the board, including you,

Lillian Li and Harry Hua, initially declined to vote affirmatively on two basic but key resolutions, one to retain Troutman Sanders as counsel to the company with an enlarged mandate to assist the internal inquiry and the second pledging the company's cooperation in the internal inquiry.  When I and some of the other independent directors asked for the reasons for the management team's troubling decision to refuse to vote for these two important and essential resolutions, the reasons given - namely that a resolution mandating cooperation was "insulting" and that Troutman Sanders had only been serving as securities counsel- were not compelling.  Unfortunately, it took me and some of the other independent directors to convince you and the management team to vote for these resolutions.

That same Thursday board of directors meeting was followed almost immediately by additional requests from Latham directed to the company via Troutman Sanders, as well as requests from me directly to management including, among other things, payment of the retainer for Latham, payment of a retainer for Troutman Sanders (which was essential for the inquiry to progress as expeditiously as possible), payment of newly issued invoices by the company's independent auditors, and a request for the company to immediately provide answers to several questions, together with supporting documents.  All of these items could have (and should have) been done in a few hours of work.  Instead of responding promptly to these requests and assisting in the conduct of the internal inquiry at a point when every day counted, you instead became unavailable to me

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 33 -

Law Offices of
Clifford A. Cantor, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

and some others on the board.  It has now been five days since I last heard from you, even though you have, during the same period, interacted with selected members of the board of directors.  All of the requests directed to the company have gone unanswered and no retainer fees have been paid.  As a result of these delays, the internal inquiry has yet to begin.

On Monday, ***management for the company instructed Troutman Sanders not to file any notice of claim with the company's insurance carriers under the company's directors' and officers' liability policies, contrary to Troutman's advice.***  This decision together with other factors, prompted Troutman Sanders, which as noted above has served as company counsel for some time, to withdraw.  This will now mean a significant delay in the independent inquiry as new counsel steps into the picture.  Management also has not complied with any of the requests made by me or counsel conducting the independent inquiry – including the most rudimentary demands, such as for an organizational chart – nor has it paid the necessary retainers for Latham & Watkins or Troutman Sanders.  Moreover, during this entire period, I have heard nothing from you or other members of the management team, except for our CFO, Jean Pierre Dallaire.

I understand that yesterday you met with the auditors in Toronto in a meeting in which little or no progress was made in addressing the significant issues that remain open in the audit process.  Moreover, I still have not heard from you, even though you have been in contact with other members of the management team, other board members, and the auditors.  Yesterday evening, I renewed my requests for the payment of the appropriate retainers and the production of important information and documents that are essential preliminary steps to launching the independent inquiry.  I also added a request to see a draft of the 8K filing which must be made tomorrow.  I asked that those items be complied with by 1 PM today.  As of that time, aside from the efforts of Jean Pierre to collect documents under his control regarding activities in the United States, none of my requests had been complied with.

This series of events, beginning gradually during the difficulties in the audit process and then increasing over the last week, ***the uncooperative conduct of the management team at the board of directors meeting, and now the current failure to communicate with me at a point when every second counts, coupled with a pattern of decisions by management that are difficult for me to understand, have left the company without its long-standing outside counsel at a crucial moment, have failed to advance the audit process and have failed even to initiate, let alone move forward, the independent inquiry***, leads me to the conclusion that I can no longer be effective in my efforts to help the company move forward.  My interest in seeing this process through to its completion remains unwavering, but the continued resistance of management to these

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 34 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

necessary steps has made it impossible to advance this effort.  Accordingly, I am compelled by conscience to resign from the board of directors and the audit committee, effective immediately.  (Emphasis added.)

82.     Director Intrater's letter discloses in great detail the numerous steps he attempted to take to unravel the accounting misconduct at the Company and how defendants refused to cooperate with his investigation and blocked the Company's independent auditors from reviewing data necessary to audit the reported sales and revenues of HQSM.

### DEFENDANTS' OWNERSHIP OF HQSM SHARES

83.     Defendants own shares of HQSM as shown in the following table:

| Beneficial Owner | Number of Shares of Common Stock | Percent of Common Stock Beneficially Owned | Number of Shares of Series A Preferred Stock | Percent of Series A Preferred Stock Beneficially Owned | Percentage of Total Voting Power |
|---|---|---|---|---|---|
| Norbert Sporns | 796,761 | 4.5% | 24,000 | 24.0% | 21.0% |
| Lillian Wang Li | 828, 918 | 4.6% | 25,000 | 25.0% | 21.9% |
| Harry Wang Hua | 1,639,993 | 9.2% | 51,000 | 51.0% | 44.6% |
| Andrew Intrater | 8,669 | * | — | — | * |
| Fred Bild | 13,725 | * | — | — | * |
| Daniel Too | 15,600 | * | — | — | * |
| Kevin M. Fitzsimmons | 1,439 | * | — | — | * |
| Jean-Pierre Dallaire | 10,000 | * | — | — | * |
| All directors & executive officers as a group | 3,315,105 | 18.5% | 100,000 | 100.0% | 87.6% |

### DERIVATIVE AND DEMAND-EXCUSED ALLEGATIONS

84.     Plaintiff brings this action derivatively in the right and for the benefit of HQSM to redress injuries suffered, and to be suffered, by HQSM as a direct result of the breaches of

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 35 -

1   fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust

2   enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. HQSM is

3   named as a nominal defendant solely in a derivative capacity. This is not a collusive action to

4   confer jurisdiction in this Court that it would not otherwise have.

5       85.   Plaintiff will adequately and fairly represent the interests of HQSM and its

6   shareholders in enforcing and prosecuting its rights.

7       86.   At the time that this action was commenced, the HQSM Board consisted of the

8   following six directors: defendants Sporns, Li, Hua, Bild, Too, and Fitzsimmons.

9       87.   As a result of the facts set forth herein, plaintiff has not made any demand on the

10  HQSM Board to institute this action against the Individual Defendants. Such demand would be a

11  futile and useless act with respect to each and every one of the Individual Defendants because

12  they are incapable of making an independent and disinterested decision to institute and

13  vigorously prosecute this action for the following reasons:

14          a.   The Company has admitted in its 2009 14A proxy statement that

15      defendants Sporns, Li, and Hua were not independent directors pursuant to the

16      requirements of the NYSE Amex and applicable SEC regulations. In fact, defendants

17      Sporns, Li, and Hua, as illustrated in the chart above, control 87.5 percent of the total

18      voting power of the Company;

19          b.   Defendant Li is the wife of defendant Sporns. This familial relationship

20      renders demand futile because, in order to bring this suit, defendant Li would have to

21      vote for the Company to sue her husband, defendant Sporns;

22          c.   Defendant Hua is the brother of defendant Li and brother-in-law of

23      defendant Sporns. This familial relationship renders demand futile because, in order to

24      bring this suit, defendant Hua would have to vote for the Company to sue his sister and

25      brother-in-law;

26          d.   Defendants face a substantial likelihood of being held liable for breaching

27      their fiduciary duties of loyalty and good faith as alleged herein, and are therefore

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 36 -

incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

   e. The principal professional occupation of defendants Sporns, Wang, and Li was their employment with the Company, pursuant to which they received significant compensation from the Company as illustrated more fully below:

| 2009 Executive Director Compensation | | | | |
|---|---|---|---|---|
| Executive | Salary | Bonus | All Other Compensation | Total |
| Norbert Sporns | $241,576 | $80,526 | $30,442 | $352,544 |
| Lillian Wang Li | $241,576 | $161,051 | $30,442 | $326,030 |
| Harry Wang Hua | $161,051 | $161,051 | N/A | $322,102 |

| 2008 Executive Director Compensation | | | | |
|---|---|---|---|---|
| Executive | Salary | Bonus | All Other Compensation | Total |
| Norbert Sporns | $219,615 | $73,205 | $30,442 | $326,030 |
| Lillian Wang Li | $219,615 | $146,410 | $33,210 | $399,235 |
| Harry Wang Hua | $146,410 | $133,310 | N/A | $292,820 |

   f. HQSM's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock-option awards.  These defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options.  The following charts illustrate the substantial compensation that these directors have received, which demonstrates that demand upon such individuals would be futile:

| 2009 Non-Executive Director Compensation | | | | |
|---|---|---|---|---|
| Director | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
| Fred Bild | $24,157 | $15,000 | 0 | 43,280 |
| Daniel Too | $24,157 | $15,000 | — | 43,280 |

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

| K. Fitzsimmons | $20,000 | | — | 20,000 |
|---|---|---|---|---|

| 2008 Non-Executive Director Compensation | | | | |
|---|---|---|---|---|
| Director | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
| Fred Bild | $28,280 | $15,000 | 0 | $43,280 |
| Daniel Too | $28,280 | $15,000 | 0 | $43,280 |

g.      The entire HQSM Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, HQSM's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above referenced defendants breached the fiduciary duties they owed to HQSM and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.  Thus, the HQSM Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome because their actions have subjected HQSM to millions of dollars in potential liability for violations of applicable securities laws;

h.      Defendants Sporns and Dallaire certified certain of HQSM's SEC filings.  Accordingly, demand is futile as they face a substantial likelihood of liability for breach of fiduciary duties owed to HQSM;

i.      Defendants Bild and Too served as members of HQSM's Audit Committee during the Relevant Period.  Defendants Bild and Too were aware of the Company's ongoing unlawful and improper business practices and the dissemination of materially false and misleading statements and, yet, still permitted the Company to portray to the public the Company's false and misleading information despite their heightened fiduciary obligations as members of the Company's Audit Committee.  The

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

purpose of HQSM's Audit Committee was to assist the Board in fulfilling its oversight responsibilities for financial matters.  Specifically, the Audit Committee was to assist the Board in overseeing (1) the quality and integrity of the Company's financial statements; (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditors' qualifications and independence; and (4) the performance of the company's internal audit functions and independent auditors, as well as other matters which may come before it as directed by the Board.  The Audit Committee, moreover, is responsible for discussing the annual audited financial statements and the quarterly unaudited financial statements with management and the independent auditor prior to filing with the SEC in the Company's annual report on Form 10-K and quarterly reports on Form 10-Q.  Additionally, the Audit Committee met privately, outside the presence of HQSM's management, with the Company's independent registered public accounting firm to discuss, among other matters, HQSM's internal accounting control policies and procedures and the financial statements included in the Company's annual reports on Form 10-K and Quarterly reports on Form 10-Q.  As part of its oversight role with respect to the Company's financial statements and the public disclosure of the Company's financial results, the Company's Audit Committee regularly reviewed and discussed with HQSM's management the financial statements included in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q, its quarterly earnings releases, and the financial guidance that the Company provided to analysts, ratings agencies, and the public.  As a result, defendants Bild and Too knew, or should have known, of the Company's wrongdoing alleged herein, but intentionally or recklessly violated their duties as members of the Audit Committee.  Specifically, because of these duties and responsibilities—particularly the Audit Committee's responsibility to discuss the Company's financial information and earnings guidance with HQSM's management prior to release—members of the Audit Committee were aware that HQSM's positive statements about the Company's prospects and growth were made without a reasonable

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 39 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

basis.  As such, defendants Bild and Too breached their fiduciary duties of loyalty and

good faith to the Company.  Additionally, the failure of defendants Bild and Too to

perform their duties as members of the Audit Committee with loyalty and in good faith

raises a substantial likelihood of non-exculpated personal liability on their part.  As a

result, defendants Bild and Too cannot impartially consider a demand on the Board to

commence litigation against themselves;

    j.    Defendants Sporns, Li, and Hua lack independence from defendants Bild

and Too because they exert influence over the compensation for defendants Sporns, Li,

and Hua by virtue of their positions as members of the Compensation Committee.  The

Compensation Committee annually reviews and approves corporate goals and objectives

relevant to the compensation for defendants Sporns, Li, and Hua evaluates their

performance in light of those goals and objectives, and approves their compensation level

based upon these evaluations;

    k.    Each of the key officers and directors knew of and/or directly benefited

from the wrongdoing complained of herein thereby rendering demand futile;

    l.    The Individual Defendants approved and/or permitted the wrongs alleged

herein to have occurred and participated in efforts to conceal or disguise those wrongs

from HQSM's stockholders or recklessly and/or negligently disregarded the wrongs

complained of herein, and are therefore not disinterested parties;

    m.    In order to bring this suit, all of HQSM's directors would be forced to vote

as a Board, by a majority, for the Company to sue themselves and persons with whom

they have extensive business and personal entanglements—which they will not do—

thereby excusing demand;

    n.    The acts complained of constitute violations of the fiduciary duties owed

by HQSM's officers and directors and these acts are incapable of ratification;

    o.    Each of the Individual Defendants authorized and/or permitted the false

statements disseminated directly to the public and which were made available and

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 40 -

distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully supervise prosecution of such a suit even if they caused the Company to institute it;

p.   Any suit by the Company to remedy these wrongs would likely expose the Individual Defendants and HQSM to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, they are hopelessly conflicted in making any supposedly independent determination of whether the Company should sue themselves;

q.   HQSM has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for HQSM any part of the damages HQSM suffered and will suffer thereby; and

r.   If the current directors were to cause the Company to bring this action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

88.   Despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for HQSM for any of the wrongdoing alleged by plaintiff herein.

89.   Plaintiff, moreover, has not made any demand on other shareholders of HQSM to institute this action since demand would be a futile and useless act for the following reasons:

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

a.       HQSM is a publicly held company with over 17,895,175 million shares outstanding, and hundreds if not thousands of shareholders;

b.       Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out their names, addresses, or phone numbers; and

c.       Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

90.       The conduct complained of herein could not have been the product of good-faith business judgment, and each of the directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected HQSM to substantial damages.  Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class action, *Jason Moomjy v. HQ Sustainable Maritime Industries, Inc. et al.*, No. C11-726 RSL (W.D. Wash.).  Through their intentional misconduct, Individual Defendants have subjected the Company to potential costs, fines, and judgments associated with the securities class action. Such actions by the Individual Defendants cannot be protected by the business judgment rule. Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## COUNT I

### Breach of Fiduciary Duty

### (against all Individual Defendants)

91.       Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

92.       Defendants owed fiduciary duties to HQSM as described herein.

93.       Defendants breached those fiduciary duties by failing to properly supervise and monitor the adequacy of HQSM's internal controls, by allowing the Company to issue and disseminate misleading statements and filings, and by engaging in a sustained and systematic

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    failure to exercise their oversight responsibilities and to ensure that HQSM complied with

2    applicable laws, rules, and regulations.

3        94.    As members of the HQSM Board, the Individual Defendants were directly

4    responsible for authorizing, permitting the authorization of, or failing to monitor the practices

5    that resulted in violations of applicable laws and duties as alleged herein.  Each of them had

6    knowledge of and actively participated in, approved, and/or acquiesced in the wrongdoing

7    alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.  The

8    alleged acts of wrongdoing have caused the Company unreasonable loss and expenses and

9    subjected the Company to further unreasonable risks of loss and expenses.

10        95.    Each of defendants' acts in causing or permitting the Company to disseminate

11   material misrepresentations and omissions to the investing public and abdicating his or her

12   oversight responsibilities to the Company have subjected the Company to liability for violations

13   of applicable laws and therefore were not the product of a valid exercise of business judgment,

14   constituting a complete abdication of their duties as officers and/or directors of the Company.

15   As a result of defendants' breaches, HQSM is the subject of a securities fraud class action by

16   defrauded investors, and the Company's reputation in the business community and financial

17   markets has been irreparably tarnished.

18                              **COUNT II**

19                        **Gross Mismanagement**

20                  **(against all Individual Defendants)**

21        96.    Plaintiff incorporates by reference each of the preceding paragraphs as though

22   they were set forth in full herein.

23        97.    Defendants had a duty to HQSM and its shareholders to prudently supervise,

24   manage, and control the operations, business, and internal financial accounting and disclosures

25   of the Company.  Defendants, by their actions and omissions and by engaging in the wrongdoing

26   alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently

27   managing the business of HQSM in a manner consistent with the duties imposed upon them by

VERIFIED SHAREHOLDER          - 43 -
DERIVATIVE COMPLAINT

1   law.  By committing the misconduct alleged herein, defendants breached their duties of due care,

2   diligence, and candor in the management and administration of HQSM's affairs and in the use

3   and preservation of the Company's assets.

4   98.     During the course of the discharge of their duties, defendants were or should have

5   been aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless,

6   defendants engaged in, and caused HQSM to engage in, the actions described herein which they

7   knew had an unreasonable risk of damage to the Company, thus breaching their duties to the

8   Company.  As a result, defendants grossly mismanaged HQSM, thereby causing damage to the

9   Company.

10                                    **COUNT III**

11                        **Contribution and Indemnification**

12                        **(against all Individual Defendants)**

13   99.     Plaintiff incorporates by reference each of the preceding paragraphs as though

14   they were set forth in full herein.

15   100.    HQSM is alleged to be liable to various persons, entities, and/or classes by virtue

16   of the facts alleged herein that give rise to defendants' liability to the Company.

17   101.    HQSM's alleged liability on account of the wrongful acts, practices, and related

18   misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad-

19   faith acts or omissions of defendants, and the Company is entitled to contribution and

20   indemnification from each defendant in connection with all such claims that have been, are, or

21   may in the future be asserted against HQSM, by virtue of the Individual Defendants' misconduct.

22                                    **COUNT IV**

23                              **Abuse of Control**

24                        **(against all Individual Defendants)**

25   102.    Plaintiff incorporates by reference each of the preceding paragraphs as though

26   they were set forth in full herein.

27

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT
- 44 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

103.   The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over HQSM.

104.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff has no adequate remedy at law.

**COUNT IV**

**Waste of Corporate Assets**

**(against all Individual Defendants)**

105.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

106.   The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of HQSM.

107.   As a direct and proximate result, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Awarding injunctive relief against all of the Individual Defendants and in favor of the Company to prevent furtherance of the conduct complained of herein;

C.   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

108.   Granting such other and further relief as the Court deems just or equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

- 45 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    Dated:  May 31, 2011            Respectfully submitted,

2

3                                   LAW OFFICES OF CLIFFORD A. CANTOR, P.C.

By:  s/  Cliff Cantor, WSBA # 17893

4                                   627 208th Ave. SE

Sammamish, WA 98704-7033

5                                   Tel:  (425) 868-7813

Fax:  (425) 868-7870

6                                   cliff.cantor@comcast.net

7

8                                   GLANCY BINKOW & GOLDBERG LLP

Lionel Z. Glancy

9                                   Robert V. Prongay

Louis Boyarsky

10                                 1801 Avenue of the Stars, Suite 311

Los Angeles, CA 90067

11                                 Tel:  (310) 201-9150

Fax:  (310) 201-9160

12

13                                 Counsel for Plaintiff Alan Hopkins

14

15

16

17

18

19

20

21

22

23

24

25

26

27

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

## VERIFICATION AND AFFIDAVIT OF ALAN HOPKINS

STATE OF _Pennsylvania_ )
                        )    ss:
COUNTY OF _York_ )

ALAN HOPKINS, being duly sworn, deposes and says:

1.    I am a plaintiff in this action.  Subject to the penalties of perjury, I verify that I have reviewed the Class Action Complaint (the "Complaint") to be filed in this action, and the facts stated in the Complaint as they concern my acts and deeds are true to my personal knowledge.  I believe that the facts that are pled in the Complaint on information and belief or investigation of counsel are true.

2.    I have not received, been promised or offered and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this class action except for (i) such damages or other relief as the Court may award me as a member of the class, (ii) such fees, costs or other payments as the Court expressly approves to be paid to me or my attorneys, or (iii) reimbursement of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of the action.

_____
ALAN HOPKINS

Sworn to before me this
25th day of _May_ , 2011

_Marian A. Dwyer_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Marian A. Dwyer, Notary Public
Stewartstown Borough, York County
My Commission Expires Nov. 26, 2014